**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WEST COAST HOME BUILDERS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AVENTIS CROPSCIENCE USA INC. *et al.*, <br><br> Defendants. | No. C 04-2225 SI <br> Related to C 04-2648 SI <br><br> **ORDER RE: SUMMARY JUDGMENT MOTIONS** |

On August 21, 2009, the Court held a hearing on a number of motions for summary judgment. For the reasons set forth below, the Court GRANTS in part and DENIES in part plaintiff's motion for partial summary judgment, GRANTS the motion for summary judgment on the RCRA claim filed by TRC, GBF and the Generator defendants, and GRANTS in part and DENIES in part defendants' motions for summary judgment on the continuing private nuisance and continuing trespass claims.

**BACKGROUND**

In 1987, plaintiff West Coast Home Builders, Inc.'s predecessor purchased 332 acres from Standard Oil, "for a prospective residential development." Third Amended Compl. ¶ 49. The property had been operated by Chevron as a crude oil tank farm from about 1913 until the mid-1980s, and as a result, there was hydrocarbon contamination of the surface soils throughout the property at the time of purchase. *Id*. ¶ 50. WCHB has developed a portion of the property, "Highlands Ranch Phase I," and that property is not at issue in this case.

This case involves the undeveloped portion of the property, approximately 169 acres located northwest of what was once the Contra Costa Sanitary Landfill (the "Landfill"). The Landfill was

1  operated from 1963 until 1992. WCHB has sued the current owner of the Landfill, GBF Holdings, Inc.,
2  GBF's environmental consultant responsible for remediation activities at the Landfill, TRC Companies,
3  Inc., and the "Generator defendants" and the "Federal defendants." The "Generator defendants"[1] and
4  the "Federal defendants" are the original generators, arrangers and/or transporters of the solid waste and
5  hazardous waste that is present in soil and in the groundwater plume underneath the Property. WCHB
6  alleges that groundwater contamination emanating from the Landfill has moved beneath its property.

7  WCHB wants to develop the property, and in 2007 submitted a proposal for a mixed commercial
8  and residential project, the "Highlands Ranch Phase II" development, to the City of Antioch. The City
9  of Antioch denied the proposed development on the ground that it was inconsistent with the uses
10 mandated by Antioch's General Plan. WCHB still intends to develop the property.

11 The Landfill is already the subject of ongoing remediation efforts. In 1993, the California
12 Department of Toxic Substances ("DTSC") issued a Remedial Action Order requiring various
13 potentially responsible parties to undertake an investigation of contamination at the Landfill. In 1997,
14 the DTSC issued a Remedial Action Plan ("RAP") for the Landfill. The RAP called for a groundwater
15 pump-and treat system with extraction wells both near the Landfill and near the leading edge of the
16 contaminant plume, installation and maintenance of a landfill cap, modification and maintenance of the
17 landfill gas system, and groundwater monitoring. McFarland Decl. Ex. 1 (RAP at 25). The RAP states
18 that the purpose of the landfill cap was to "minimize the amount of water able to migrate through the
19 landfill material and leach contaminants into the groundwater." *Id*. The purpose of the extraction wells
20 was to "control further migrations of contaminants in the groundwater." *Id*. The RAP also provides that
21 the cleanup standards for groundwater were cleanup "to background" or at a minimum to maximum
22 contaminant levels ("MCLs"). *Id*. at 16.[2]

---

[1] Plaintiff also sued Mary Grace Prewett Bertsch and Harold Prewett. The Prewetts are represented by the same counsel as TRC, GBF and the Generator defendants, and are often included with the Generator defendants. The Generator defendants include 35 private entities and the Federal defendants are the United States Department of the Army, United States Department of Defense, and the United States Department of the Navy.

[2] Cleanup "to background" means to clean up until concentrations of the chemicals of potential concern can no longer be detected using standard laboratory techniques. Cleanup to MCLs means to clean up until concentrations of the chemicals of potential concern are lower than the maximum level

GBF began remediating the Landfill in 2001 under DTSC's supervision pursuant to a Consent Order which incorporated the RAP. In 1996, some of the parties that sent waste to the Landfill for disposal brought suit before this court against the entities who owned and operated the Landfill to achieve an allocation of cleanup costs among the parties. *Members of the Pittsburg/GBF Landfill Respondents Group v. Contra Costa Waste Services, Inc.*, C 96-3147 SI ("*CCWS Case*"). The *CCWS Case* settled in 2001. The settlement involved the parties to the *CCWS Case* paying various amounts into a settlement fund, the proceeds of which were transferred to GBF. Through various contractual mechanisms, GBF has assumed sole responsibility for remediating the Landfill. Wilson Decl. ¶ 3. On July 13, 2001, GBF entered into a Consent Order with DTSC. McFarland Decl. Ex. 2 (Consent Order). GBF is the sole respondent under the Consent Order. *Id*.

The Consent Order requires GBF to, *inter alia*, (1) install and maintain a landfill cap, (2) design and install a groundwater extraction and treatment system at the downgradient edge of the Landfill, (3) modify and maintain a landfill gas system, (4) install additional groundwater monitoring wells and conduct groundwater monitoring, and (5) design and install a groundwater extraction and treatment system at the downgradient edge of the offsite plume or submit a request for modification of this offsite remedy. *Id*. Since 2001, TRC (on behalf of GBF) has worked under the supervision of DTSC and the Regional Water Quality Control Board and implemented the measures approved by those agencies under the Consent Order, relative to the groundwater contamination. Wilson Decl. ¶ 8; *see generally id*. at ¶¶ 8-14 (describing measures implemented by TRC).

In May 2006, GBF submitted a request for modification of the offsite remedy on the grounds that monitored natural attenuation ("MNA") would be a more appropriate remedy than the offsite remedy called for in the RAP. *Id*. ¶ 15. MNA uses bacteria existing in the subsurface to naturally bioremediate contamination. In response to GBF's request for modification, the DTSC requested that TRC evaluate several different remedial options for the offsite plume. *Id*. ¶ 16. On November 16, 2007, TRC turned in its Groundwater Remedial Alternatives Evaluation to the DTSC. *Id*. ¶ 17. At a meeting between DTSC and TRC on November 26, 2007, DTSC requested that additional sampling and analysis

---

allowed in drinking water under federal and state standards.

of MNA parameters be conducted. *Id*. On September 26, 2008, TRC submitted its Addendum to Groundwater Remedial Alternatives Analysis, which included the additional sampling and analysis. *Id.* In a memorandum dated October 8, 2008, DTSC stated that "MNA is likely to be an appropriate remedial alternative for the downgradient residual plume remedy." *Id*. DTSC also recommended five revisions to the Groundwater Remedial Alternative Evaluation, and on March 23, 2009, TRC submitted a Revised Groundwater Remedial Alternative Evaluation incorporating those recommendations. *Id*. The DTSC now has the issue under submission.

## I.   RCRA

The parties have filed cross-motions for summary judgment on plaintiff's claim under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k. RCRA authorizes any person who has provided the statutorily required notice of intent to commence a civil action

> against any person, including the United States . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . .

42 U.S.C. § 6972(a)(1)(B). RCRA provides for injunctive relief and attorneys' fees and costs, but does not provide for monetary damages or cleanup costs. With regard to injunctive relief, RCRA states,

> The district court shall have jurisdiction . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both . . . .

*Id*. at § 6972(a). The Third Amended Complaint (TAC) seeks an injunction compelling defendants to "implement the measures necessary to abate the endangerment to health and the environment to the satisfaction of the [California Department of Toxic Substances], the Regional Water Quality Control Board, and any other regulatory agencies that may assert jurisdiction over the abatement of hazardous conditions at the Property." TAC p. 22-23.

Defendants contend that plaintiff's RCRA claim is barred because plaintiff is asking the Court to engage in an idle act because GBF is already complying with the remedial directives of the DTSC pursuant to the Consent Order. Defendants note that DTSC has jurisdiction over hazardous substances cleanups in California pursuant to the California Health & Safety Code and the federal CERCLA statute.

4

Cal. Health & safety Code §§ 25300 *et seq.*; 42 U.S.C. § 9604(c)(3); *see also City of Lodi v. Randtron*, 118 Cal. App. 4th 337, 351 (2004). Because the Landfill has been listed as a hazardous substance release site by DTSC pursuant to the California Hazardous Substance Account Act ("HSAA"), all action with respect to the hazardous substances releases must comply with the HSAA. *City of Lodi*, 118 Cal. App. 4th at 353 ("DTSC is charged 'with sole responsibility for ensuring that required action in response to a hazardous substance release or threatened release at a listed site is carried out in compliance with the procedures, standards, and other requirements set forth in this chapter, and shall, as appropriate, coordinate the involvement of interested or affected agencies in the response action.'") (quoting Cal. Health & Safety Code § 25356).

Defendants contend that plaintiff's RCRA claim is barred for three reasons: (1) plaintiff lacks constitutional standing because plaintiff seeks an order that will not redress the harm it alleges; (2) plaintiff is not entitled to injunctive relief because it cannot demonstrate irreparable harm; and (3) under the primary jurisdiction doctrine, the administrative forum provided by DTSC is the appropriate forum for resolution of plaintiff's claims regarding the cleanup of the offsite groundwater plume. The gravamen of all three arguments is that WCHB is already receiving the relief it seeks – remediation of the groundwater plume – through TRC/GBF's implementation of the Consent Order and RAP pursuant to the oversight of the DTSC.

Plaintiff argues that its RCRA claim is not barred because the DTSC is not addressing the vapor intrusion issues on plaintiff's property caused by defendants' groundwater plume. Plaintiff argues that the DTSC's RAP assumed that the properties to the north of the landfill that were then undeveloped (including plaintiff's property) would remain undeveloped. Plaintiff argues that, as a result, the RAP did not consider the indoor health risks from groundwater contamination *if the property was developed*, and plaintiff asserts that the actual remedial work being performed at the landfill site is not lessening the vapor intrusion risk. Plaintiff contends that the Court can design injunctive remedies to address plaintiff's injuries without conflicting with ongoing DTSC efforts. Plaintiff argues that the Court can order defendants to immediately undertake the site-specific soil gas and other health risk assessment investigation studies necessary to quantify and address these risks, can order defendants to implement additional site-specific remedies that would contain further spread of the plume and decrease chlorinated

solvent concentrations, and order affirmative injunctive relief requiring defendants to fund and implement necessary mitigation measures under plaintiff's buildings to protect occupants from indoor vapor intrusion dangers.

Defendants respond that the purported deficiencies identified by plaintiff, and the proposed injunctive relief, were not pled in the Third Amended Complaint. Defendants note that plaintiff does not request, or even mention, indoor air intrusion mitigation measures in the TAC. Defendants also argue that the RAP never considered vapor intrusion issues on the property because the property was vacant and there were no plans to develop it – and defendants argue that nothing has changed in this regard because plaintiff still has no concrete plans to develop the Property.

The Court agrees with defendants that plaintiff's RCRA claim fails and thus that defendants are entitled to summary judgment. There are two fundamental problems with plaintiff's RCRA claim. First, the Consent Order already requires GBF/TRC to clean up the groundwater contamination, and that remediation has been underway for years. Plaintiff seeks relief that it is already obtaining outside of this lawsuit, and aside from the alleged vapor intrusion issues discussed *infra*, plaintiff "has identified nothing whatsoever that this Court could order defendant to do to supplement [already existing remediation] efforts." *87th St. Owners Corp. v. Carnegie-Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1220-21 (S.D.N.Y 2002) (dismissing RCRA claim as moot due to ongoing state-supervised cleanup addressing contamination). That the RCRA injunctive relief claim is superfluous is demonstrated by the relief sought by the complaint, which is simply an order directing defendants to implement remedial measures to the satisfaction of the DTSC and any other regulatory agencies that "may assert jurisdiction" over the abatement of hazardous conditions at the property. Whether this is viewed as a lack of standing because the harm will not be redressed by this Court, or as a failure to demonstrate entitlement to relief under RCRA, the problem is the same: there is no basis for the relief plaintiff seeks because the contamination is already being addressed by the DTSC through the Consent Order and the RAP. *See Glanton v. AdvancePCS, Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) ("There is no redressability, and thus no standing, where . . . any prospective benefits depend on an independent actor who retains 'broad and legitimate discretion the courts cannot presume to control or to predict.'") (internal citation omitted); *87th St. Owners*, 251 F. Supp. 2d at 1220-21; *Kara-Holding Corp. v. Getty*

6

1 *Petroleum Mktg.. Inc.*, 99 Civ. 0275 (RWS), 2004 WL 1811427, at *11 (S.D.N.Y. Aug. 12, 2004) (granting defendants summary judgment on RCRA claim where "Kara has not shown that the remediation plan proposed by the plaintiff is necessary to insure that the petroleum contamination is no longer an imminent and substantial endangerment in light of the considerable remediation that has already taken place.").

Plaintiff contends that the current remediation plan does not address the danger posed by vapor intrusion, and thus that the RCRA injunctive relief is not superfluous. There are a number of problems with this assertion. First, even if the Court granted the relief that plaintiff describes in its papers regarding soil vapor, such as ordering TRC to conduct a study of the site-specific soil gas conditions, DTSC would necessarily be involved in that process, and would make the determination as to whether mitigation was necessary. Plaintiff concedes as much. *See* Cullen Decl. ¶¶ 41-42 ("soil vapor investigation will include interaction with DTSC as the regulatory oversight agency, the development of a workplan, implementation of a side-wide soil vapor investigation, and reporting the results").

More importantly, the alleged soil vapor danger only exists *if* plaintiff develops the property, and all of the evidence submitted by plaintiff about vapor intrusion risks is contingent on development. *See* Spence Decl. ¶ 6 ("I explained the human health risks from vapor intrusion that were present for the *planned development* of Plaintiff's West Coast and SPPI Properties . . . ."). If and when plaintiff develops its property, plaintiff can approach the DTSC about this issue. Plaintiff does not contend that there is any current danger posed by soil vapor (and even if it did, DTSC would address it). In order to obtain injunctive relief under RCRA, plaintiff must show an "imminent and substantial endangerment" to health or the environment. 42 U.S.C. § 6972(a).

The Supreme Court has said that the language of the RCRA " 'implies that there must be a threat which is present now, although the impact of the threat may not be felt until later.'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 486, (1996) (quoting *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)). Only if injury is "sufficiently likely" will the balance of harm tilt in favor of injunctive relief. *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987). Here, the dangers identified by plaintiff all depend on future development, and there is no "imminent and substantial endangerment" that can be remedied by this Court. The Court finds instructive the recent decision by

7

the Second Circuit in *Simsbury-Avon Preservation Soc. LLC v. Metacon Gun Club*, __ F.3d __, 2009 WL 2341924 (2d Cir. July 31, 2009). In that case, the Second Circuit found summary judgment in favor of the defendants was proper on the plaintiff's RCRA claim. The court held that discarded lead at a gun club site did not present an "imminent and substantial endangerment to health or environment," and thus did not warrant injunctive relief under RCRA, despite the plaintiff's expert report that found that various samples drawn from site exceeded state thresholds for residential sites and concluded that lead represented potential exposure risk to humans and wildlife. *Id*. at *10-11. The court found that there was no triable issue of fact on "imminent and substantial endangerment" where the report did not state the degree of potential exposure to lead contamination on site, or provide any evidence that anyone was subject to long-term exposure to lead contamination at site, or that there were realistic pathways of exposure there. *Id.* That is precisely the case here. *See also Avondale Federal Savings Bank v. Amoco Oil Co.*, 170 F.3d 692, 695 (7th Cir. 1999) (holding RCRA claim premature because "Avondale's own expert testified that 'if excavation is ever performed under the streets adjacent to the property, petroleum contamination will be found at levels requiring abatement to protect health and the environment.' Thus off-site contamination may very well present an imminent and substantial danger at some point, but it does not present such a danger right now."); *Price v. United States*, 818 F. Supp. 1323, 1325 (S.D. Cal. 1992) (if no pathway of exposure, no imminent endangerment).

**II.    CERCLA**

Plaintiff seeks partial summary judgment on liability under Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") for response costs relating to groundwater, soil and surface contamination. The elements of a Section 107 response cost claim are: (1) the area on which hazardous substances are found must constitute a defined "facility"; (2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred; (3) the plaintiff has incurred "response costs" that are "necessary" and "consistent with the National Contingency Plan ('NCP')"; and (4) the defendant is among one of four classes of persons subject to liability. 42 U.S.C. § 9607(a)(4)(B); *Carson Harbor Village Ltd. v. Unocal Corp.*, 227 F.3d 1196 (9th Cir. 2000).

Defendants oppose summary judgment on the ground that plaintiff's costs do not meet the

8

1 definition of "response costs."³ Plaintiff claims two types of costs as "response costs": expert witness
2 fees incurred in connection with this litigation, and costs incurred by plaintiff's counsel. Plaintiff asserts
3 that its "experts have examined the nature and extent of the groundwater contamination in an effort to
4 ensure effective remediation" and that its "attorneys have met with regulators and reviewed and
5 commented on submissions by other responsible parties, such as for a containment zone application."
6 Plaintiff's motion at 18:4-12.

7 "CERCLA Section 107 does not provide for the award of private litigants' attorney's fees
8 associated with bringing a cost recovery action." *Key Tronic Corp. v. United States*, 511 U.S. 809, 819
9 (1994). Where a private litigant's attorneys fees "have not advanced the cleanup" of the contamination,
10 those costs are not recoverable. *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 953 (9th Cir.
11 2002). Similarly, expert costs incurred primarily for litigation are not recoverable. *See Louisiana-*
12 *Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1577 (9th Cir. 1994); *Gussack Realty Co. v. Xerox Corp.*,
13 224 F.3d 85, 92 (2d Cir. 2000) (expenditures on experts not "closely tied to the actual cleanup" are not
14 necessary response costs).

15 Defendants contend that plaintiff has failed to demonstrate that the sought costs are "response
16 costs" as opposed to unrecoverable litigation costs. Plaintiff responds that the amount of costs can be
17 determined at trial, and that "defendants' arguments regarding the recoverability of particular line items
18 in attorney fees or consultant invoices do not go to liability but to the extent of damages, and should be
19 addressed at trial." Reply at 7:20-22. Plaintiff also asserts that the Court can defer until trial the
20 questions of necessity and NCP consistency. While the Court agrees that the trial will only focus on the
21 remaining disputed issues, the Court cannot grant summary judgment on liability as requested by
22 plaintiff because plaintiff has the burden of showing, as an element of a Section 107 claim, that it has
23 incurred "response costs" that are "necessary" and consistent with the NCP. *See Ascomb Properties Inc.*
24 *v. Mobil Co.*, 866 F.2d 1149, 1154 (9th Cir. 1989) ("[I]f a plaintiff ultimately fails to show a proper
25 response cost, then he will fail to prove his prima facie case."); *Carson Harbor Village, Ltd. v. Unocal*

---

³ The TRC defendants also contend that none of plaintiff's costs were "necessary" or were incurred "consistent with the NCP." However, plaintiff's motion for summary judgment only seeks a determination that it has incurred recoverable "response costs," and explicitly requests that any determination of "necessity" or consistency with the NCP be deferred to trial.

9

*Corp.*, 287 F. Supp. 2d 1118, 1154 n.218 (C.D. Cal. 2003) ("It is appropriate to require a CERCLA plaintiff to prove compliance with the NCP in order to survive a motion for summary judgment because damages are a fundamental component of a private party CERCLA claim, and if the recovery of damages is foreclosed because the plaintiff has failed to comply with the NCP, there is no need to try issues of liability.").[4] To the extent defendants have not disputed the other elements of plaintiff's CERCLA response cost claim, plaintiff's motion is GRANTED. At trial, in order to prevail on this claim, plaintiff will need to establish that the fees and costs sought are "response costs" that were "necessary" and consistent with the NCP.

### III.   Continuing nuisance and continuing trespass

Plaintiff alleges claims for private continuing nuisance and continuing trespass against GBF, TRC and the Generator defendants. These claims allege that defendants "used and/or maintained said premises or conducted their business and operations in an unnecessary, unreasonable and injurious manner that allowed wastes to be accumulated at the Landfill and into the surface and sub-surface soils and groundwaters, including into the soils and groundwaters of the Property" and that such disposal has created a continuing nuisance and trespass interfering with plaintiff's enjoyment of its property. TAC ¶¶ 114-27. All parties have moved for summary judgment on these claims.

#### A.   TRC defendants

Plaintiff moves for summary judgment of liability against the TRC defendants. The TRC defendants argue that they cannot be held liable for the continuing nuisance and trespass claims because they did not own or operate the Landfill. However, "under California law, both the parties who maintain the nuisance and the parties who create the nuisance are responsible for the ensuing damages." *Newhall Land & Farming Co. v. Superior Court*, 19 Cal. App. 4th 334, 343 (1993). Plaintiff contends that the

---

[4] Plaintiff also asserts that this Court "has utilized this same approach in prior related litigation," citing a September 8, 1999 order in *Members of the Pittsburg/GBF Landfill Respondents Group v. Contra Costa Waste Services, Inc.*, C 96-3147 SI. However, as discussed in that order, the defendants conceded three elements of the CERCLA claim, including that the plaintiffs had incurred "response costs," and the only disputed question was whether the defendants were responsible parties under CERCLA.

10

TRC defendants are liable because they have failed to abate the groundwater plume underlying plaintiff's property. In order to warrant summary judgment, plaintiff must show that there are no triable issues of fact as to, *inter alia*, whether defendants have interfered with plaintiff's private use and enjoyment of their property, and whether that interference was substantial and unreasonable. CA BAJI § 8.60. As GBF/TRC notes, they have been remediating the groundwater plume pursuant to the Consent Order and RAP. At the very least, defendants' ongoing remediation raises triable issues of fact as to whether defendants have interfered with plaintiff's use of the property and the reasonableness of defendants' conduct.

Defendants in turn move for summary judgment on the ground that plaintiff's damages are so uncertain and speculative as to be unrecoverable as a matter of law. Defendants challenge the damages opinion by plaintiff's expert on numerous grounds. Plaintiff claims damages of almost $13 million for its purported inability to develop the Property as a result of the groundwater contamination emanating from the Landfill and lying beneath a portion of the proposed Highlands Ranch Phase II development. This damages calculation is based on the following assumptions: (1) WCHB will build the Highlands Ranch Phase II development, (2) WCHB would have been able to undertake development beginning in 2003, and that full development would have been complete by mid-2004, and (3) WCHB would have been able to easily sell all the homes in the development. Defendants argue that these assumptions are deeply flawed because Antioch denied the Highlands Ranch Phase II development, WCHB could not have begun development in 2003 because there are a number of lengthy steps WCHB would be required to go through in order to proceed with the Highlands Ranch Phase II development, and plaintiff's expert did not engage in any supply and demand analysis and thus the assumption that WCHB would be able to easily sell the homes is unfounded.

To the extent defendants argue that plaintiff has not suffered any injury, the Court disagrees, as plaintiff claims that its property interest has been harmed as a result of contamination flowing from the Landfill, and that this contamination has prevented plaintiff from developing the land. To the extent that defendants challenge various conclusions reached by plaintiff's expert – such as contending that he made a number of unsupported assumptions about the speed and ease with which plaintiff could secure approval for, build and sell the Highlands Ranch Phase II development – those issues go to the

1 weight rather than the admissibility of plaintiff's evidence of damage. As such, there are factual issues
2 inappropriate for summary judgment.

### B.     Generator defendants

The Generator defendants contend that plaintiff's claims fail because plaintiff cannot show that these defendants' conduct was unreasonable, reckless or negligent (for continuing nuisance) or intentional, reckless or negligent (for continuing trespass). *See Hellman v. La Cumbre Golf & Country Club*, 6 Cal. App. 4th 1224, 1230-31 (1992) (continuing nuisance); *Wilson v. Interlake Steel Co.*, 32 Cal.3d 229 (1982) (continuing trespass). The Generator defendants argue that the most that plaintiff can show is that the Generator defendants sent hazardous substances and waste to the Landfill. The Generator defendants argue that it is undisputed that they had no responsibility for the operations at the Landfill, and it is the operation of the Landfill that plaintiff claims gives0 rise to the groundwater contamination now existing under portions of its property. The Generator defendants argue that plaintiff's discovery responses confirm that the only basis for its claims against the Generator defendants is their disposal of waste at the landfills.

In response, plaintiff raises a variety of unavailing arguments. Plaintiff contends that a defendant may be liable for a nuisance without negligence. While plaintiff is correct that negligence is not a necessary element of a nuisance claim, in the absence of negligence there must be some intentional conduct that is unreasonable. *See Hellman*, 6 Cal. App. 4th at 1230.

> An action for private nuisance is designed to redress a substantial and unreasonable invasion of one's interest in the free use and enjoyment of one's property. The invasion may be intentional and unreasonable. It may be unintentional but caused by negligent or reckless conduct; or it may result from an abnormally dangerous activity for which there is strict liability. On any of these bases the defendant may be liable. On the other hand, the invasion may be intentional but reasonable; or it may be entirely accidental and not fall within any of the categories mentioned above.

*Id*. at 1230-31. The cases cited by plaintiff do not hold otherwise. *See Shields v. Wondries*, 154 Cal. App. 2d 249, 255 (1957) ("A nuisance may not, necessarily, grow out of acts of negligence, but may be the result of skillfully directed efforts – efforts which may be skillfully directed towards others accomplishing the desired end, but which may not have due regard for the rights of others."); *see also Sturges v. Charles L. Harney, Inc.*, 165 Cal. App. 2d 306, 318 (1958) (citing *Shields* for the same

proposition). Moreover, both *Shields* and *Sturges* demonstrate that in order for liability to attach, a defendant must have intentionally done some act which caused the nuisance. In *Shields*, the defendant property owners constructed improvements to control the flow of water on their property, and those improvements allegedly caused a flood on the plaintiff neighbor's property. *Shields*, 154 Cal. App. 2d at 255. In *Sturges*, the defendant failed to comply with various provisions of the city building code and negligence was established "as a matter of law." *Sturges*, 165 Cal. App. 2d at 318. In any event, the defendant was held liable for nuisance because the defendant engaged in various construction operations on his property which caused flooding and other damage to adjoining landowners. *Id*.

Plaintiff also contends that it can hold the Generator defendants liable even though they did not own or operate the landfills. As support, plaintiff cites *Mangini v. Aerojet-General Corporation*, 230 Cal. App. 3d 1125 (1991). However, *Mangini* simply holds that a former landowner who allegedly created the nuisance cannot escape liability on the ground that the defendant no longer holds a possessory interest. "Nor is it material that defendant allegedly created the nuisance at some time in the past but does not currently have a possessory interest in the property. [N]ot only is the party who maintains the nuisance liable but also the party or parties who create or assist in its creation are responsible for the ensuing damages." *Id*. at 1137 (internal quotations omitted). The *Mangini* court cited a number of cases and noted that "these authorities refute defendant's assertion, unsupported by authority that 'one cannot be guilty of committing a nuisance unless it [ sic] is in the position to abate it.'" *Id*. at 1137 n.7. In *Mangini*, the prior landowner defendant had allegedly caused the nuisance by burning and burying waste rocket fuel materials and other hazardous substances on the property. *Id*. at 1132.

Here, the Generator defendants are entitled to summary judgment because their conduct – disposing of their waste at the landfill – did not create or assist in the creation of the nuisance. Plaintiff has not submitted any evidence suggesting that defendants' conduct was unreasonable. It is undisputed that the Generator defendants played no part in the operation of the Landfill, and it is undisputed that the Generator defendants' only role with respect to the Landfill was having their waste taken there for purposes of its disposal. Defendants' conduct is too attenuated from the creation of the alleged nuisance. It is true that there would be no nuisance without the disposal of solid and hazardous waste

13

at the Landfill. However, plaintiff claims that the *cause* of the nuisance was the improper handling of the waste at the Landfill – such as the absence of a liner, operating leachate collection system, or an operating vadose zone monitoring system at the Landfill – which is conduct flowing from the operation of the Landfill, not from the Generator defendants' disposal of waste at the Landfill.

For the same reasons, the Court finds that it is appropriate to enter summary judgment in favor of defendants Mary Grace Prewett Bertsch and Harold William Prewett. These defendants were included in the Generator defendants' motion. *See* Docket No. 180 at 6 n.4. According to the declaration of Mary Grace Prewett Bertsch, when her brother Harold was 12 and living at the Christian Brothers orphanage in Berkeley, California, and she was 11 and living in a boarding school or foster home, they each inherited a 1/6 interest in property included in what came to be known as the CCSL. Bertsch Decl. ¶ 5.[5] Ms. Bertsch states,

> However, we did not learn of our inheritance for a number of years afterwards. My uncle, E.A.H. Prewett, owned half of the Landfill Property and held my brother's and my interest in trust from approximately 1947 through 1960. In 1960, my brother's and my interest in the Landfill Property increased to 1/4 each, which E.A.H. Prewett continued to hold in trust.
>
> I have an understanding that E.A.H. Prewett leased the Landfill Property to various entities between approximately 1947 through 1973. Neither myself, nor my brother had any involvement in those lease transactions. Neither myself, nor my brother ever had any involvement in operations on the Landfill Property. My brother and I received small periodic rent payments from E.A.H. Prewett.
>
> E.A.H. Prewett sold our interest, along with his, in the Landfill Property in 1973.

*Id*. ¶¶ 6-8. Plaintiff does not dispute this evidence, and indeed at the hearing on these motions, plaintiff's counsel stated that the only basis for seeking to hold the Prewetts liable was their status as fractional owners of the landfill. For all of the reasons stated above, that is not enough to raise a triable issue of fact as to these defendants' liability under either a continuing nuisance or continuing trespass theory.

---

[5] The Prewetts became wards of the State after their father was killed in an automobile accident in 1935 when Harold was 1 year old and Mary was one month old, and their mother was later institutionalized. *Id*. ¶¶ 3-4.

14

**IV.  Objections to evidence**

The parties have filed voluminous evidentiary objections. To the extent the parties object to the expert declarations on various grounds, the Court finds that while particular objections to particular statements may be well-founded, in general the objections go to the weight rather than the admissibility of those declarations. The parties may renew objections to specific testimony at the time of trial. With regard to the objections to non-expert declarations and evidence, the Court finds it unnecessary to rule on the objections because the Court does not rely on that evidence in this order. Moreover, a number of the objections are not true evidentiary objections, but argument of counsel as to the interpretation of evidence.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and DENIES in part plaintiff's motion for partial summary judgment, GRANTS the motion for summary judgment on the RCRA claim filed by TRC, GBF and the Generator defendants, and GRANTS in part and DENIES in part defendants' motions for summary judgment on the continuing private nuisance and continuing trespass claims. (Docket Nos. 176, 180, 183 & 184).

**IT IS SO ORDERED.**

Dated: August 21, 2009

SUSAN ILLSTON
United States District Judge